## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

## S. Hayward WILLS et al., Defendants.

### Civ. A. No. 77–0097.

United States District Court, District of Columbia.

Dec. 14, 1978.

Irwin M. Borowski, New York City, Richard S. Kraut, Peter M. Sullivan, Richard J. Morvillo, Kathleen G. Gallagher, Richard O. Patterson, Robert J. Haft, Sp. Counsel, Washington, D. C., for plaintiff.

Burton H. Finkelstein, Douglas G. Thompson, Jr., John F. McCarthy, III, Washington, D. C., for Wills.

James E. Tolan and Richard A. Martin of Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for Stuken.

## MEMORANDUM OPINION

GESELL, District Judge.

By this civil action the Securities and Exchange Commission ("SEC"), alleging violations of the federal security laws, seeks both injunctive relief and disgorgement against two former officers of a now-bankrupt land development corporate complex. The SEC has alleged that the defendants did not make disclosures as mandated by Sections 13(a) and 14(a) & (e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78m(a) & 78n(a) & (e) (1976), and by Rules 13a–1, 13a–11, 13a–13, and 14a–9, 17 C.F.R. §§ 240.13a–1, 240.13a–11, 240.13a–13 & 240.14a–9. The SEC also contends that, in connection with such nondisclosures, the defendants violated the anti-fraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1976), Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a) (1976), and Rule 10b–5, 17 C.F.R. § 240.-10b–5 (1977), as well as the interstate prospectus rule of section 5(b)(1) of the Securities Act, 15 U.S.C. § 77e(b)(1) (1976).

Following a substantial bench trial, the submission of detailed proposed findings of fact and briefs, and oral arguments, the Court now enters its findings of fact and conclusions of law.

### I. *The Facts*

A. *The Business and Capitalization of Properties and Credit, and Credit's Public Filings.*

The proof concerns the operations of GAC Corporation ("GAC"), a holding company; GAC Properties, Inc. ("Properties"), a wholly-owned subsidiary engaged in land sales; and GAC Properties Credit, Inc. ("Credit"), a wholly-owned subsidiary of Properties and financier of Properties' land sale operations. Defendants Wills and Stuken were major officers of each of the three companies.[1]

GAC acquired Properties in 1969. Thereafter, Properties was engaged predominantly in subdividing and developing land for

---

1. Wills was Chairman of the Board, President and Chief Executive Officer of GAC; Chairman of the Board and First Vice President (later President) of Properties; and Chairman of the Board of Credit. Stuken was Vice President, Controller and Principal Accounting Officer of GAC; Vice President of Properties; and Vice President, Chief Accounting Officer, and Treasurer of Credit. He was also a Director of Credit and, from May to June 1975, a Director of GAC.

sale. The bulk of Properties' sales were made prior to completion of most of the necessary improvement work and on the installment basis, sometimes involving downpayments of as little as two and one-half percent. Properties' sales contracts uniformly required it to perform all related development work, meaning that it had to make substantial cash outlays prior to receiving the land's full purchase price. Consequently, it depended heavily on external sources to finance its operations.

Credit was created in 1970 to meet most of these financing needs. Credit was given the task of raising the cash needed to finance Properties' operations through public debt offerings, bank lines of credit, and collections on the installment land contract receivables which Properties' land sale operations generated.

Credit sold two issues of debentures. In November 1970, it issued $50 million of 12 percent Senior debentures due November 15, 1975 (the "1975 debentures"). In September 1971, it issued an additional $50 million Senior debentures, these with an interest rate of 11 percent and due September 1, 1977 (the "1977 debentures"). Both issues were registered under the Securities Act and under Section 12(b) of the Exchange Act. Each was also accompanied by the appropriate prospectus and indenture. The SEC does not now challenge either the accuracy or the completeness of the disclosures made in those initial documents.

The SEC's contentions center instead on the period between April 1974 and September 1975. During that time, Credit was obligated by law to file with the SEC one annual Form 10–K covering the calendar year 1974 and several quarterly 10–Q's. In addition, Credit in September 1975 sent an Exchange Offer to its 1975 debenture holders[2] and requested its 1977 debenture holders to consent to several indenture amendments.[3] Accordingly, Credit had to prepare

---

**2.** On July 1, 1975, Credit filed a Registration Statement (Form S–1) covering an exchange offer it was proposing to submit to its 1975 debenture holders. Contained in that document was a Preliminary Prospectus dated July 1, 1975 (the "first filing"). On August 28, 1975, Credit filed Amendment No. 1 to this Registration Statement, as well as a Preliminary Prospectus dated August 28, 1975 (the "second filing"). Amendment No. 2 to this Registration Statement was submitted to the SEC on September 11, 1975. This was declared effective on September 12, 1975. This filing contained the final version of the Prospectus which was then sent to the 1975 debenture holders (the "Exchange Offer Prospectus"). Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), prohibited the defendants from having made any material misstatements or omissions in this Exchange Offer Prospectus. Section 5(b)(1) of the Securities Act, 15 U.S.C. § 77e(b)(1), also made it unlawful to send the prospectus by the means of interstate commerce had it contained any material omissions or misstatements. *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1098 (2d Cir. 1972).

Consummation of the exchange offer was conditioned upon its acceptance by holders of at least 90% (reduceable by Credit to 80%) of the outstanding aggregate principal amount of 1975 debentures. It was also conditioned upon the simultaneous consent to certain indenture amendments by holders of at least 66⅔% of Credit's outstanding 1977 debentures. *See infra.*

The exchange offer provided that for each $1,000 1975 debenture tendered, the debenture holder at his option would receive (1) $1,100 principal amount of new 12% Sinking Fund Debentures due 1980 or (2) $200 in cash and $700 principal amount of New Debentures.

Even though the offer was extended three times, Credit did not receive the minimum 80% acceptance, leading to its bankruptcy.

**3.** On September 4, 1975, Credit filed a Registration Statement (Form S–14) with the SEC covering a proposed solicitation to its 1977 debenture holders. This Statement included a preliminary draft of the Solicitation Statement which was to be sent to the 1977 debenture holders. Final versions of each of these documents (titled "Amendment No. 1 to Registration Statement" and "Solicitation Statement") were submitted and declared effective on September 12, 1975.

Credit's 1977 debenture holders were requested, pursuant to the solicitation, to authorize various amendments to the 1971 indenture. The amendments included an interest rate increase from 11% to 12%, permission for Credit to make secured advances to Properties, and modification of certain restrictive covenants. Acceptance of the solicitation by the holders of the requisite 66⅔% outstanding principal amount of the 1977 debentures was obtained.

Section 240.14a–9 of 17 C.F.R., adopted pursuant to Section 14(a) of the Exchange Act, made it illegal for the defendants to have made any material misstatement or omission in the Solicitation Statement.

and file an Exchange Offer Prospectus and a Solicitation Statement. The SEC maintains that all of these documents contained material misrepresentations and omitted to state material facts.

B. *The Relationship Between Credit and Properties.*

Comprehension of the SEC's allegations requires some familiarity with the framework within which Credit operated by agreement with its debenture holders. This framework was created by an Operating Agreement into which Credit and Properties entered on November 15, 1970 (the "Operating Agreement"), by the indentures which underlay the company's two debenture issues (respectively the "1970 indenture" and the "1971 indenture"), and the two prospectuses which accompanied those issues (respectively the "1970 prospectus" and the "1971 prospectus").

The Operating Agreement provided that Credit was to enjoy first rights to Properties' Eligible Receivables [4] (Section 2), prices to be negotiated from time to time (Section 3). Correspondingly, Credit was obliged to purchase all such Receivables as Properties tendered to it (Section 2), so long as Credit was able to finance the purchases on a "reasonable basis" (Section 6).

With respect to all Eligible Receivables which Properties sold to Credit, Properties promised to perform or have performed "all acts and things for which Properties or any Real Estate Affiliate is committed under the terms of, or in connection with, any item of Receivables . . . ." (Section 12(a); *see also* Section 9). In addition, Credit "at all times" was to maintain "reserves" against the Receivables it purchased (Section 4), these reserves to be based, among other things, on percentages of Properties' own reserves, Properties' development costs, and the Receivables' gross principal amount. These "reserves" were not cash, but simply the partial nonpayment by Credit of what it owed Properties for the Eligible Receivables it undertook to purchase.[5]

The 1970 and 1971 indentures required that Credit and Properties "duly and punctually perform all of the terms, agreements and conditions of the Operating Agreement." (Section 1008). Neither corporation could "terminate, cancel, assign, or materially amend, modify or supplement the Operating Agreement" (*id.*), except with the permission of those holding at least two-thirds of the outstanding debentures. (Section 1013; Section 1012). Violation of this covenant would amount to an "event of default" (Section 501(6)).

The 1970 and 1971 indentures defined with particularity the contours of the "business" in which Credit could engage:

Neither [Credit] nor any Subsidiary will engage in any business other than dealing in Eligible Receivables or activities incidental thereto, or invest a material part of its assets in properties, assets

---

In all relevant respects the Solicitation Statement and the Exchange Offer Prospectus can be deemed identical.

**4.** The term Eligible Receivables was defined as follows:

(A)(i) Receivables which have a final maturity of not more than fifteen years from the date of acquisition by Credit, on which six monthly instalment payments (excluding the downpayment) or the equivalent have been paid, which provide for regular (but not necessarily equal or substantially equal) payments of principal quarterly or at more frequent intervals, which arise out of retail sales (including contracts to deliver deeds) or leases of real property by Properties and its Real Estate Affiliates, such real property constituting the Security therefor, and (ii) Receivables arising from the sale of mobile or modu-

lar homes, other personal property, insurance or services effected as an incident to a retail sale of real property by Properties and its Real Estate Affiliates; and

(B) Other Receivables arising as an incident to the sale or lease of real property, not exceeding in aggregate principal amount 10% of all Eligible Receivables at the time held by Credit; provided, however, that the aggregate amount of the three largest of such other Receivables shall not exceed 15% of Liquid Net Worth. (Section 13).

**5.** If a customer of Properties defaulted on an Eligible Receivable held by Credit, the Operating Agreement provided that, after 89 days, Properties would buy back the Receivable from Credit. (Section 10).

or securities other than Eligible Receivables, Short Term Debt of the United States of America, any agency thereof, any State of the United States of America or any political subdivision thereof, certificates of deposit, prime or equivalently rated commercial paper of non-affiliated issues and securities of Subsidiaries.

(Section 1004(b)).

Credit, therefore, enjoyed a flow of income which depended heavily on Properties' customers continuing to make payments on the Eligible Receivables Credit held. These customers were not legally bound to make such payments, although upon default they generally did forfeit all previously paid sums. Whether or not they would default largely depended on Properties meeting its development obligations under the installment land contracts, on overall economic conditions, and on the nature of the publicity which surrounded the installment land contract business as a whole. As to Properties' ability to continue to meet its development obligations, this rested on its success in obtaining new installment land contract receivables (to sell to Credit for cash), on not having to buy back cancelled Eligible Receivables from Credit, and, of course, on the soundness of its initial development cost predictions. Customer defaults did not proportionately reduce development costs which were largely geared to projects rather than individual lots.

The inherent weaknesses in this structure were highlighted by both the 1970 and 1971 prospectuses. There, the debenture holders were informed that Credit's Eligible Receivables "may become uncollectible" if Properties defaults on its development obligations and these obligations are not assumed by Credit.[6] The debenture holders were further warned that:

> Performance of the development obligations of Properties under instalment land contracts will require Properties to

expend substantial sums of cash over the terms of such contracts . . . . Cash expenditures to date have exceeded the total cash generated by sales, and, therefore, Properties' operations have required, and it is anticipated that they will continue to require, substantial funds in addition to cash generated from sales . . . .

In conjunction with this disclosure, the prospectuses made clear that Properties' customers were not legally bound to continue to make payments on Credit's Eligible Receivables and that "no significant resale market for instalment land contracts" existed. In short, Credit's financial posture was highly dependent on "the continued ability of Properties to operate as a going concern" and on "general economic conditions." Any adverse trend in the latter could "induce substantial numbers of contract purchasers to discontinue making installment payments . . . ."

The debenture holders were further alerted to the conflicts of interest which might arise between Properties and Credit:

> The directors and officers of the Company are also directors or officers of Properties, GAC Corporation or one of its subsidiaries and, accordingly, Properties and GAC Corporation can exert control on the Company and its affairs. As a consequence, dealings between the Company, Properties and GAC Corporation cannot be considered to be at arm's length and at times could present possible conflicts of interest.

The prospectuses also discussed the means by which the two debenture issues would probably be repaid:

> There will be no sinking fund for the Debentures and no provision for redemption in the event of a decline in levels of Eligible Receivables not in default. In the absence of future borrowing, the primary source of repayment for the Deben-

---

**6.** It was made clear to the debenture holders that all Eligible Receivables would be recorded on Credit's books "at the gross unpaid principal amount . . . , which does not purport to reflect current market value, less the re-

serves required . . . ." (p. 3). Relatedly, the prospectuses noted that reserves were "not required to be held in cash, nor do they represent cash immediately available" to Credit. (p. 4).

tures will be cash generated by the collection of Eligible Receivables held by the Company.

## C. *The Key Transactions.*

By early 1974, this fragile edifice had begun to crumble. For a variety of reasons, Properties' installment land sales started to decline drastically. Yet, many costly development obligations remained outstanding and, accordingly, Properties desperately needed to find a source of cash other than continued land sales. Otherwise, Properties could not complete the promised development work and Credit's Eligible Receivables would largely become uncollectible. This situation led to the series of events between April 1974 and September 1975 which form the basis of the SEC's suit.

Almost from its inception, Credit had, for accounting purposes, pooled its cash in GAC with all other cash receipts of the GAC complex.[7] This accounting procedure meant that all expenditures and investments on Credit's behalf, as well as for the benefit of Properties and the other components of the GAC complex, were funded by a common cash pool. It also necessitated the maintenance of an inter-company account. This account was balanced on a monthly basis through September 1974; thereafter, it was balanced on a quarterly basis. On each occasion, the balancing took place after Credit's cash had been sent to the cash pool.

Throughout the period from 1970 to September 1975, the inter-company account regularly reflected book balances that were favorable to Credit. Until April 1974, this was accomplished solely on the basis of the usual transfers to Credit of installment land contract receivables. Then in April 1974, for the first time, such transfers fell short of supporting the cash (less Credit's expenses met by the pool) which Credit had sent that month to the pool. Each subsequent accounting period until Credit's declaration of bankruptcy in December 1975 witnessed the same phenomenon.

Thus, at the end of each internal accounting period from April 1974 to September 1975, GAC's management was faced with a choice: either to cause Properties to sell to Credit assets other than the installment land contract receivables Credit had customarily bought or to return some cash to Credit from the pool. It consistently chose to adopt the former course of action.

Accordingly, a series of transactions occurred commencing in April 1974 that involved Credit's purchase of marketable securities, certificates of deposit, its own stock, fixed assets, and "other receivables." These transactions are all itemized, explained, and scheduled in Appendix A, which is incorporated herein.

With the exception of one monthly accounting period (December 1974), all of these non-customary transfers were recorded by hand-written entries on so-called "top sheets," kept "in the drawer" of one of GAC's accountants. Unlike Credit's usual journal entries, "top sheet" transactions were not entered into GAC's computer databank. December was the one accounting period when all asset transfers were entered into the GAC computer databank.

While the manner in which these transactions were posted and Credit's occasional failure adequately to perfect their documentation or effectuate formal transfers other than by bookkeeping raise questions, it is clear from the preponderance of the evidence that these transactions were in fact intended to and did in fact occur. At trial, the SEC conceded that it could not prove that any of these transactions were fictitious.

The indentures and Operating Agreement indisputably permitted Credit to purchase short-term marketable securities, certificates of deposit, and "other receivables."[8]

---

7. It is undisputed that accurate records were maintained of the amounts of cash which Credit transferred to its parent in this manner.

8. Although there apparently exists some doubt as to whether all of the "other receivables" purchased by Credit during 1974 and 1975 con-

(1970 and 1971 indentures, § 1004(b), § 101; O–A, § 13). In addition, the indentures permitted Credit—within certain limitations, apparently not transgressed during these time periods—to pay dividends and purchase its own stock.[9]

The defendants admit that these transactions were entered into to support the continued flow of cash from Credit to Properties; that Properties desperately needed funds to complete its development obligations and that such funds could realistically have only come from Credit. As put by the defendants, management had by the end of 1974 at the latest, "embarked on a course to use whatever flexibility there was, including maximum use of the dividend or treasury stock formula, in the Operating Agreement and Indentures to continue to pay over Credit's cash collections to support the operations of Properties." (Defendants' Proposed Findings, ¶ 221).

## II. *The SEC's Major Contentions and Defendants' Response*

Against this background the Court now turns to the SEC's major contentions, as the Court has been able to glean them from the SEC's various statements of position at pretrial and in its post-trial briefs. The SEC urges that material events were inadequately revealed in Credit's 1974 10–K and in its 1975 Exchange Offer Prospectus and Solicitation Statement, and that these documents should at least have included the following disclosures:

1. Credit transfers to Properties substantially all of its cash promptly upon receipt. Subsequently, "supporting transactions" are entered into with the view of keeping as much transferred cash as possible in Properties. This practice is likely to continue.

a. Credit's intention to let Properties keep as much of the cash as possible reflects a business judgment, made by GAC's management, that the needs of GAC and of Properties take precedence over Credit's need to pay at maturity its debenture obligations.

b. The described practice means that Credit is no longer engaged in the business depicted in the 1970 and 1971 indentures and prospectuses and in the Operating Agreement; thus, Credit's acts violate the strictures contained in those documents.

c. These practices make it less likely than would otherwise be the case that Credit will pay off the debentures when they mature.

d. The supporting transactions lack economic reality, *i. e.*, are of no economic benefit to Credit.

e. These transactions conceal defaults under the Operating Agreement and indentures which are otherwise occurring.

f. The certificates of deposit and the marketable securities listed as assets on Credit's balance sheets are being purchased from Properties, and not from third parties.

2. With respect to certain fixed asset purchases:

a. Their purchase at book value may not reflect actual market value, no independent appraisal having been performed;

b. Recovery of their value will occur long after the 1975 and 1977 maturity dates, for they are subject to long-term lease-backs.

3. As a result of Management's practice of transferring all of Credit's cash to Prop-

---

formed to the strictures of the Operating Agreement (see Credit's 1975 10–K, p. 56), the SEC has not raised this as an issue in this action.

**9.** The indentures' limitation as to dividend payments and/or stock redemptions was:

[Credit] will not declare, pay or set aside for payment any dividend . . . , or make any expenditure or payment for the purchase or

acquisition or redemption or retirement of [its] stock . . . which, together with all such dividends, expenditures and payments after [December 31, 1969, for the 1975 debentures; December 31, 1970, for the 1977 debentures] would exceed the consolidated net income of [Credit] and all Subsidiaries accrued after [December 31, 1969, or December 31, 1970] plus $5,000,000.

erties, there exists no "substance" to Credit's "income" for purposes of the Indentures' dividend/stock redemption restriction.

4. During 1974, Credit made contributions to the GAC complex for income taxes owed, but GAC, filing on a consolidated basis, incurred no federal income tax liability for 1974.

5. Development guarantees were given by Credit to third parties in 1974.

6. In the Exchange Offer Prospectus and in the Solicitation Statement, June 1975 balance sheet figures should have been included, not March 1975's figures.

The SEC further contends that various of the intercompany transactions operated as a fraud upon the debenture holders in violation of Section 10(b) of the Exchange Act of 1934 and of Section 17(a)(3) of the Securities Act of 1933. In particular, the SEC points to the following allegedly fraudulent practices:

1. The aforementioned insufficient disclosures.

2. The treasury stock purchases in and of themselves operated as a fraud upon Credit's debenture holders, for
 a. they were of no economic benefit to Credit or its debenture holders, had no business purpose, and were entered into to cover defaults;
 b. they were not "consistent" with the impending due dates of the debentures or with Credit's covenant to pay the debentures at maturity.

3. Credit did not give the debenture holders advance notice of its intention to effect the stock and fixed asset purchases.

Defendants urge that adequate disclosures were in fact made with the advice of their lawyers and public accountants and that there were no material omissions. Many disclosures were, in fact, made relating to the course of dealings between Properties and Credit, to the decline of Properties' business, and to other matters on which the SEC's contentions focus. Without attempting to itemize all disclosures on which the defendants rely, Appendix B lists the significant statements taken from the 1974 10–K and the 1975 Exchange Offer Prospectus and Solicitation Statement as an aid to the discussion which follows. Defendants also deny all allegations of fraud and urge that they proceeded in good faith for the best interests of the companies and the debenture holders involved.

### III. Discussion of Alleged Material Nondisclosures

Evidence was introduced relating to each of the SEC's contentions. In addition to testimony from GAC's outside public accountants and counsel, both of which had participated in the preparation of the SEC filings, the two defendants testified as well as did an SEC staff accountant. No testimony was offered from the debenture trustees, the bankruptcy trustee, or from investors. Counsel argued extensively as to whether or not material nondisclosures existed, relying on Credit's and GAC's various filings and on the inferences which could arguably be drawn one way or the other from the testimony and disclosures made.

There is a wide gap between the SEC's claims and the proof. While, as will appear, the Court does find that there were several failures to disclose material facts, many of the Commission's contentions do not withstand analysis. Before reaching those contentions, however, it must be noted that many of the significant aspects of Credit's operations were adequately covered in the pertinent public documents. The decline in Properties' land sale business was disclosed, as well as was Credit's net decline in holdings of Eligible Receivables. In addition, all the transactions which affected Credit's cash transfers were reported accurately as to character and amount. The SEC has acceded to this. Finally, the SEC was wholly unable to demonstrate that any of the inter-company transactions in marketable securities, fixed assets, treasury stock or "other receivables" contravened the Operating Agreement or the 1970 and 1971 indentures, and that Credit's public filings should have so stated. Indeed, all of these trans-

actions appear to have fallen properly within the restrictions placed upon Credit's operations. Only the fixed asset transaction might arguably be subject to question on these grounds. The Court, though, cannot find that the defendants should have disclosed this uncertainty in the 1975 Exchange Offer Prospectus or Solicitation Statement. Credit's outside auditors played a major role in determining the structure and accounting treatment of that transaction. In addition, the defendants received in the spring of 1975 an opinion from Credit's legal counsel that the transaction did not contravene the Operating Agreement or indentures. As far as the proof shows, the defendants, as non-lawyers, had no reason to question the bona fides of this affirmative opinion. Moreover, the Exchange Offer Prospectus did describe the general nature of the assets involved; thus, Credit's debenture holders had sufficient information to have drawn their own opinion, had they so desired.

■ Before advancing to the SEC's particular contentions, it is appropriate to define the standard against which must be measured any misstatements or omissions which the defendants may have made in the relevant public filings. In a word, the defendants may be held to have violated the securities laws' disclosure requirements only if they misstated or failed to disclose "material" information. In the context of Section 14(a) violations, the Supreme Court has defined "materiality":

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important . . . . What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted). This definition of materiality has since been applied to actions involving Section 13 of the Exchange Act. *See SEC v. Savoy Industries, Inc.*, 190 U.S.App.D.C. 252 at 268–269, 587 F.2d 1149 at 1165–1166 (1978).

■ The Supreme Court has also warned that an unnecessarily broad disclosure standard would cause corporate managements "simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decision-making." *TSC Industries, Inc. v. Northway, Inc., supra*, 426 U.S. at 448–49, 96 S.Ct. at 2132. Moreover, the securities laws clearly do not require a corporation's officers to make statements which they reasonably do not believe at the time to be true. Cases such as this make clear how misleading an emphasis on hindsight can be.

■ One omission highlighted by the SEC in Credit's 1974 and 1975 public filings was the lack of any explanation of the fact that Credit's cash accounts were handled at its parents' level. As of April 1974, Credit had been transferring for several years substantially all of its cash to the GAC complex. Yet, the SEC has apparently no dispute with Credit's earlier filings even though they similarly omitted to reveal this practice. Moreover, the reasonable investor would solely have been interested in the net effect which these transfers had on Credit's financial posture and not in how the bookkeeping was handled. Whether Credit paid its own expenses directly or indirectly through the medium of Properties could not have been material to such an investor, so long as genuine charges were made against the cash.

■ The SEC argues that Credit should have told the public that its management had decided by April 1974 to give preference to the needs of GAC and Properties over Credit's obligation to pay its debentures at their maturity. This contention is discussed more fully below in the context of the SEC's fraud allegations. As stated there, the Court finds that no such decision

was made by management, but rather that the defendants believed that their actions were in the long-range best interests of the debenture holders. The Court similarly rejects the SEC's claim that Credit should have told the public that the practices in which it was engaged made it less likely than otherwise would have been the case that Credit would be able to pay off the debentures at their maturity. The defendants did not have reason to believe that such was in fact the case.[10]

■ As previously noted, the SEC focused on several aspects of the inter-company transactions and the disclosures related thereto. Except for one of these contentions, the Court rejects the SEC's position on this subject. The one exception is the Commission's argument that the three documents under scrutiny here were deficient in not pointing out that the marketable securities and certificates of deposit listed as assets on credit's various balance sheets had been purchased from Properties and not from any outside entity. The Operating Agreement and the indentures placed no restriction on who could sell eligible assets to Credit. Nonetheless, the omission in question has to be deemed material. Inclusion of the information would have made more evident the extent to which Properties desperately needed Credit's cash. In December 1974, more than $9.4 million of supporting transactions involved marketable securities and certificates of deposit. These amounts were revealed in Credit's 1974 10-K, but no indication was there given that the amounts reflected "supporting transactions"—offsetting cash transfers to Proper-

ties—rather than open market purchases. Similar treatment was given the $2.3 million in certificates of deposit and marketable securities which were listed in the 1975 Exchange Offer Prospectus and Solicitation Statement.

■ Credit's public filings should, it is contended, have explained that several of the transactions afforded Credit no net economic benefit. The Court rejects this claim. Not only were the transactions genuine but, if anything, a good number of the assets transferred were of a higher investment caliber than the installment land contract receivables with respect to which the SEC does not voice any complaint. To be sure, the treasury stock purchases provided Credit no economic benefit. Yet, these transactions were expressly permitted by the indentures. Their occurrence was also fully disclosed in the relevant public filings, as well as was the fact that throughout 1974 and 1975 Credit was a wholly-owned subsidiary of Properties.

■ The SEC urges that the Exchange Offer Prospectus and the Solicitation Statement should have stated that the fixed assets transferred in 1975 to Credit were purchased at prices which "might" not have reflected their actual market values. Net book values were used in these transactions. The SEC, however, has not presented sufficient proof that Credit's management knew or should have known with reasonable certainty that the net book values substantially overstated real asset values.[11] Absent such actual or constructive knowledge, disclosure along the lines desired by the SEC was not required. Also rejected is

10. The Commission claims that the three pertinent public documents did not disclose Credit's intention to repay, if possible, the 1975 debentures *both* by the cash generated in the business and through refinancing. An examination of the statements made in those filings reveals that this argument has absolutely no foundation. *See* Appendix B.

11. The SEC points to a statement made in court by defendant Stuken in response to the following question:

Put yourself back to March of 1975. Did you believe that the assets sold in the fixed assets

transaction had a market value close to its book value?
Stuken's response was:
Not on for sale by any means, no. In other words, you couldn't put a stake in the ground, say "For Sale" and hope to get that cash within any short-term period. (Tr. 1199).
This response is too ambiguous for the Court to conclude that the defendants believed that the fixed assets' book value substantially overstated their real value. According to the defendants, Stuken was referring in his answer to a "forced sale."

the SEC's argument that the Exchange Offer Prospectus and the Solicitation Statement did not sufficiently highlight the long-term nature of the lease-backs which Credit entered into in 1975 with respect to the purchased fixed assets. The documents stated that the leases on real property would extend over ten years and that rental payments on all other properties were computed at a rate of 110% of annual depreciation.

The SEC has from time to time during these proceedings contended that the 1974 10–K and the 1975 Exchange Offer Prospectus and Solicitation Statement should have flatly stated that the supporting transactions were entered into solely to conceal defaults under the Operating Agreement and indentures. This contention lacks merit. Defaults would have occurred if Properties had not paid Credit's expenses or had not transferred, as promised, eligible receivables to Credit. These events could equally well be said to have "concealed defaults" under the SEC's line of reasoning; yet, the plaintiff has no complaint with respect to these more usual transactions. Thus, this particular argument is rejected.

The Court also rejects the SEC's contention that Credit should have informed the public that Credit's "income" had no "substance" for purposes of the indentures' dividend/stock redemption restriction. In part, this argument merely restates the SEC's belief that the cash pooling arrangement should have been disclosed, a belief to which this Court, as already noted, does not subscribe. In part, the SEC's discomfort must also be with the indentures which it apparently views as having been inartfully drawn. This, of course, is not a proper subject for SEC concern, for the terms of the indentures were never concealed from the debenture holders.

■ The defendants admit that, beginning sometime in 1974, they were consciously using all the flexibility which the Operating Agreement and the indentures provided to send Credit's cash up to Properties. The 1975 Exchange Offer and Solicitation State-

ment made this express admission. The SEC contends that the 1974 10–K should similarly have disclosed this intention. The Court is unable to subscribe to this contention. The 1974 10–K revealed the considerable extent to which Credit was purchasing from Properties assets other than the normal land installment contract receivables. Credit's debenture holders had to have realized that this amounted to a change from the pre-1974 course of events, a change that they must be charged with having contemplated given the contents of the Operating Agreement and the indentures. To be sure, the 1974 10–K did not state the reasons why Credit was purchasing so many atypical assets from Properties. Yet, the change was one which they must have understood given the other disclosures in the 1974 10–K. Properties' considerable need for cash had been known since Credit's inception. The 10–K delineated the declines in the land sale business which Properties had suffered, as well as the increased rate of receivable cancellations. No other than the true explanation for the non-customary transactions could have appeared to the debenture holders. Furthermore, having known since Credit's inception that such transactions might become a regular aspect of Credit's business and knowing that they had been effected in large dollar amounts during 1974, the average debenture holder could have only inferred—after reading the 1974 10–K—that Credit's management would in all probability continue along the same path.

■ The SEC claims that Credit, in fact, affirmatively misrepresented in the two pertinent filings the business in which it was engaged when, in a description of that business, it described the kinds of assets it was purchasing to finance Properties' operations. Credit stated that its "principal business . . . since 1970 has been to provide financing for Properties by purchasing installment land contracts arising from sales of land by Properties." The Court cannot conclude that this amounted to a material misrepresentation. As noted before, the three pertinent documents dis-

closed the most significant of the supporting transactions which had taken place during the periods respectively covered by those filings. In addition, the statement quoted above refers to Credit's activity since 1970. Over that entire period, Credit had clearly effectuated a net "purchase" of installment land contract receivables to help finance Properties' operations. To be sure, in 1974 Credit suffered a net decline in receivables of nearly $40 million and this trend continued through 1975. The term "purchase," however, need not necessarily refer to *net* increases in receivable holdings. It may just as easily have been intended to refer to buying "activity" in such assets; both years witnessed a considerable amount of this. Finally, installment land contracts were clearly Credit's principal balance sheet asset during both 1974 and 1975.

The SEC has a further contention as regards Credit's public description of the "business" in which it was engaged. The Court finds itself in agreement with the Commission on this matter. Credit's public filings gave the distinct impression that Credit was acting as Properties' financier by providing Properties with cash when and only when Credit was itself supplied with assets to purchase.[12] The scenario pictured was that assets would be "shown" by Properties to Credit, and solely on the strength of that "showing," Credit would supply Properties with funds. As of April 1974, however, this description was no longer accurate. During each internal accounting period from April 1974 to September 1975, Credit's cash (less expenses paid) was first

put at Properties' immediate disposal; then, near or at the end of each such period, offsetting asset transfers were made from Properties to Credit. This was one result of GAC's decision that the interests of the entire GAC complex, including Credit, would be best served by giving Properties all possible means to meet its development work obligations. Some of the internal accounting periods in question extended over no more than a month. Time lags of this magnitude could reasonably be expected of a business handling as many daily transactions as did GAC. Every other internal accounting period, on the other hand, lasted three months. The Court finds lags of this sort to be so long as to indicate that Credit's line of business had undergone a subtle but fundamental transformation. Credit no longer acted as Properties' financier by purchasing Properties' non-liquid assets; instead Credit was acting as a mere unsecured creditor of Properties.

All parties agree that it was not Credit's authorized business to advance funds to Properties as an unsecured lender and that engaging in such behavior might arguably have constituted an event of default under the Operating Agreement and indentures. (*See* Defendants' Response to SEC's Proposed Findings, p. 7). Three months in the lending business is also not an insignificant period of time and substantial sums of money were at stake during each of the internal accounting periods in question. For instance, in December 1974, supporting transactions amounting to over $24 million had to be entered into. In March 1975, $19

---

12. For instance, the 1974 10–K made the following statements:

 [P]ayment of [cash] to Properties . . . is restricted, under the terms of the Operating Agreement and the indentures . . . , to payment *for additional* Eligible Receivables, release of withheld reserves against receivables collected, *unpaid balances* with respect to contracts *purchased* or as dividends or [stock redemptions] . . . . (emphasis added) (p. 2)

 [Credit] from time to time makes payments to Properties against [the amount Credit still owes Properties for purchased Eligible Receivables], and *Properties* from time to time *advances* funds to [Credit] which are credited

to the balance payable to Properties. (Emphasis added) (p. 6).

The 1975 Exchange Offer Prospectus said:
Under the terms of the Operating Agreement, Properties is obligated to *tender* to [Credit] substantially all of its "Eligible Receivables" and [Credit], on its part, is obligated to purchase them to the extent that it is reasonably able to do so. (Emphasis added.) (p. 19).

[P]ayments of funds to Properties by [Credit] are limited to payments for receivables *acquired* by [Credit] (including *later* releases of reserves withheld by [Credit] at the time of the initial acquisition); . . . . (Emphasis added) (p. 19).

million of cash transfers had occurred over the course of the prior three months and had to be balanced by supporting transactions. Furthermore, this change in Credit's line of business was not a mere transient phenomenon. It continued unabated from at least April 1974 through September 1975. Finally, it appears that, during this period, GAC's management had every intention of continuing the practice.

■ The Court, therefore, concludes that Credit's actual line of business was, from at least April 1974 to September 1975, fundamentally different from the business being described in Credit's concurrent public filings. Further, the Court concludes that omitting to make any mention of this change was material. Materiality is found first because the line of business in which Credit was actually engaged would have been a matter of great importance to the typical bondholder. The change in question greatly affected the riskiness of the enterprise in which Credit was engaged. Although in actuality repayment of the cash advanced by Credit was always accomplished at the end of each relevant internal accounting period, this does not detract from the fact that the cash advances when made were far riskier from a financial standpoint than they were depicted to be in Credit's public filings. In addition, the change in Credit's line of business, arguably at least, amounted to a default under the indentures and the Operating Agreement. This in itself makes the change a "material" one, at least from the standpoint of the typical debenture holder.

A further material omission found by the Court relates to several development "guarantees" which Credit issued in 1974 to various third parties. The first was a letter (titled "assurances"), dated February 21, 1974, and executed by Russell E. Kemmerer on behalf of Credit. This letter was sent to the Division of Florida Land Sales in re-

sponse to a request made by the Division. In pertinent part, the letter stated:

> In the event of the failure of Properties for any reason to perform the development commitments for which it is obligated under . . . the Operating Agreement . . . , Credit hereby agrees to perform such obligations with respect to any and all receivables which it holds at such time, to the end that the integrity and collectibility of such receivables will be maintained to the fullest extent of Credit's available resources.

The second "guarantee" was given in September 1974 under a settlement agreement ending several class-action suits. Credit undertook a "separate and independent obligation to" complete and pay such costs of development which Properties failed to perform "with respect to any and all receivables which [Credit] holds" at the time of Properties' default. It was provided that these "obligations of Credit . . . shall be primary and direct in all respects, shall not be deemed derivative or subject to any inter-company defenses or offsets as between Properties and Credit, and shall not be deemed subject or subordinate in any manner to any other liabilities or obligations of Credit."

■ Credit's official public filings omitted any mention, until September, 1975,[13] of these promises. The Court finds this omission to be material. The Operating Agreement had made clear that all development work was Properties' responsibility, not Credit's. Nowhere in that contract nor in the 1970 and 1971 indentures was it stated that Credit would have to take on those obligations in the event Properties no longer could. To be sure, a reasonable debenture holder might assume that, should Properties default, Credit might attempt to fulfill as many of these obligations as it could, since, practically speaking, the collectibility of Credit's receivable assets depended on the fulfillment of Properties' development

---

13. And, at that time, only the guarantee given the Florida Board was divulged. The class action guarantees were never revealed, during the period in question, in Credit's official filings or in the material sent to its debenture holders. Only the disclosures made in these documents are relevant to the issues at hand.

obligations.[14] On the other hand, such an investor would not expect Credit, at least in advance of any default, to promise to underwrite *all* of Properties' unfulfilled development work required by the eligible receivables Credit would hold. Credit, when the time came, might not have the resources to do so or might, using its best business judgment, determine that such a course of action was not in its own interests. In short, the guarantees Credit made in 1974 were inconsistent with the reasonable expectations of the typical bondholder and therefore should have been disclosed in Credit's September 1974 8–K and 1974 10–K.

Another material omission found by the Court relates to the following note in the accountant's report contained in Credit's 1974 10–K:

> The results of operations of the Company are included in the consolidated state and Federal income tax returns of GAC Corporation. The Company's tax liability, determined on a separate return basis, has been credited against receivables on which no cash has been advanced. (p. 18 n. (8)).

The federal income "tax liability" in question amounted to $4,008,000. Not disclosed was the fact that GAC as a whole incurred no federal income tax liability for 1974. (GAC 1974 10–K, pp. 10, F–4, F–13). The Court finds this omission to be material. The disclosure gave the impression that the $4 million plus figure was an actual "tax liability." At least insofar as Credit's federal income taxes were concerned, and assuming the reasonable debenture holder would interpret "tax liability" to mean an actual obligation to some taxing authority, this just was not so. GAC, as a consolidated tax entity, incurred no federal income tax liability in 1974; thus the $4 million plus figure was neither a direct nor an indirect "tax liability" to the IRS.

The Court, it should be noted, has no dispute with Credit's use of the separate return method as a possibly proper means of publicly reporting tax allocations between related corporations which file on a consolidated basis. The American Institute of Certified Public Accountants has indicated its provisional preference for this method of reporting a subsidiary's share of a consolidated group's taxes. *See* Accounting Standards Executive Committee of the American Institute of Certified Public Accountants, *Exposure Draft: Proposed Statement of Position on Reporting Intercorporate Tax Allocations, March 15, 1978.* What the Court does find missing in Credit's 1974 10–K is a sufficient explanation of what the disclosures which were made actually meant. More particularly, the Court believes that Credit's 1974 10–K should have stated that: (1) the 1974 federal income tax amount listed in Credit's 1974 financial statements was not based on any actual dollar amount which Credit directly or indirectly owed the IRS in 1974, but rather was a figure that over the long term was considered a fair way of allocating for accounting purposes GAC's total tax liability among its various divisions and subsidiaries; (2) accordingly, the figure reported was not an actual "tax liability"; and (3) in 1974 GAC incurred a total federal income tax liability that was substantially below the intercorporate "tax liability" reported on Credit's financial statements. Without these disclosures, Credit's 1974 10–K has to be deemed materially deficient.

Lastly, the Commission contends that Credit's September 1975 Exchange Offer Prospectus and Solicitation Statement were misleading in that they included the company's March 1975 unaudited balance sheet and not its June 1975 unaudited balance sheet. The more current information was available to the defendants sometime in August 1975, shortly before the start-up date of the exchange offer. The SEC argues that this omission was material, for the March 1975 financial statement showed an inter-company balance of over $6 million

---

14. The 1974 10–K, in effect, so stated:

 In the event of a default by Properties in the performance of [the development] obliga-

tions, the contracts may become uncollectible unless Properties' obligations are assumed by [Credit].

favorable to Credit, whereas the June 1975 statement showed only a $400,000 plus balance favorable to Credit despite the fact that additional supporting transactions had been effectuated. The defendants respond that this omission could not have been material since the 1974 10–K had revealed an even smaller inter-company balance favorable to Credit ($106,000) and since the September 1975 filings gave sufficient warning of the likelihood of bankruptcy. In addition, the latter two filings did provide certain financial information updated to June 30, 1975, including Credit's income and capitalization statements. All the same, the omission in question was material for the reason given by the Commission. To a debenture holder attempting to assess the information in the Exchange Offer Prospectus or in the Solicitation Statement, the status of the inter-company account as of December 1974 would have seemed far less significant than the condition of the account at some point in 1975; moreover, June's data in this regard would obviously have been more thoroughly studied than March's. General statements of financial weakness are also not adequate substitutes for the most current specific data available which underpin that weakness.

█ The material omissions found by the Court are sufficient to establish violations by defendants of Sections 13(a) and 14(a) & (e) of the Exchange Act, and Section 5(b)(1) of the Securities Act. Under all these provisions, the SEC need not prove scienter.[15] *SEC v. Savoy Industries, Inc.,* 190 U.S.App.D.C. at 269–270, 587 F.2d at 1166–1167 (1978), found that scienter was not a prerequisite to a Section 13(d)(1) violation and, therefore, that the District Court had not erred in failing to make any finding with respect to the individual defendant's state of mind. Section 13(a), like Section 13(d)(1), is "a reporting, and not an anti-

fraud, provision." Like Section 13(d)(1), Section 13(a) "gives no hint that intentional conduct need be found, but rather, appears to place a simple and affirmative duty of reporting on certain persons." *See also SEC v. Great American Industries, Inc.,* 407 F.2d 453, 457 (2d Cir. 1968), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969). Similar reasoning has led several courts to hold Section 14(a) free of any scienter requirement; negligence alone can support a finding that Section 14(a) has been violated. *See Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 777–78 (3d Cir. 1976); *Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d 1281, 1298–1301 (2d Cir. 1973) (Friendly, J.); *cf., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 n. 28, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In addition, it has been held that Section 5(b)(1) may be violated by negligent conduct in cases seeking equitable relief. *SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1047 (2d Cir. 1976), *cert. denied sub nom. Homans v. SEC,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). For the reasons suggested below with respect to Section 17(a), the Court also finds that scienter need not be shown by the SEC under Section 14(e) of the Exchange Act.

The Court will not consider whether or not violations of Section 13(a), Section 14(a) or Section 14(e) could, if need be, be premised on less than negligent conduct, *i. e.,* on a strict liability basis. The Court finds that, with respect to the material misstatements and omissions heretofore discussed, defendants acted negligently. They knew all the facts which underlay the material omissions discussed above. Under these circumstances, the Court's findings that the omissions were material automatically render the defendants' conduct negligent.

Defendants, therefore, violated Section 13(a) of the Exchange Act with respect to

---

**15.** The core meaning of "scienter" in the securities law context is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). The term has also been sometimes interpreted to embrace "reckless behavior."

*See id.* The First Circuit has defined "intent to deceive" as saying "something, that is expected to be relied on, that is not believed to be true, or, if strictly true, is hoped will be understood in an untruthful sense." *SEC v. World Radio Mission, Inc.,* 544 F.2d 535, 540 (1st Cir. 1976).

the following areas: (1) the source of Credit's marketable securities and certificates of deposit, (2) the business in which Credit was actually engaged, (3) the Florida and class action development obligation guarantees, and (4) the true nature of Credit's tax "liability" to GAC.[16] The defendants are found to have violated Section 14(a) & (e) of the Exchange Act and Section 5(b)(1) of the Securities Act with respect to the following areas: (1) the source of Credit's marketable securities and certificates of deposit, (2) the business in which Credit was actually engaged, (3) the class action guarantees, and (4) the inclusion of Credit's March 1975 balance sheet figures instead of its June 1975 balance sheet statistics.

### IV. *Discussion of Alleged Fraud*

The Commission has several theories of fraud.

### A. *Section 10(b) and Rule 10b–5*

The SEC contends that the defendants, during the years in question, violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (1976) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1977).

Section 10(b) of the Exchange Act declares it "unlawful for any person, directly or indirectly," using any means of interstate commerce, to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of" such rules as the SEC may prescribe. Pursuant to this authority, the Commission has promulgated Rule 10b–5, which reads in pertinent part:

It shall be unlawful for any person, directly or indirectly, . . .

. . . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

The "securities" involved here are Credit's two issues of debentures. During the period in question, these debentures were being continually "purchased and sold" on the public securities markets; occasionally, the cash pool also purchased these debentures in order to retire them. This activity is sufficient to meet Section 10(b)'s requirement that there be some "nexus to a purchase or sale." *See SEC v. Savoy Industries, Inc., supra,* 190 U.S.App.D.C. at 274, 587 F.2d at 1171.

The term "fraud" in subsection (c) of Rule 10b–5 has been narrowly interpreted by the Supreme Court. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), stated that:

The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception.

*Id.* at 473, 97 S.Ct. at 1301. Since "manipulation"[17] is not a factor in this case, the SEC may make out a 10b–5 violation only if it can show that defendants engaged in "deceptive" practices. A "breach of fiduciary duty . . ., without any deception, misrepresentation, or nondisclosure" does not violate the statute. *Id.* at 476, 97 S.Ct. at 1302.

The term, "deceptive practices," certainly includes the making by a corporation of material misstatements or omissions in its public filings. As shown above, the Court finds that defendants made various material misstatements or omissions in Credit's public filings during the period

---

16. The Court, however, finds that the plaintiff has neither explained nor met its burden of proof with respect to its contentions under Rule 13a–13.

17. The term "manipulative" refers to "practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.* at 476, 97 S.Ct. at 1302.

running from mid-1974 through September 1975. This conduct (leaving aside the issue of intent) therefore falls within the proscriptions of both subsection (b) and subsection (c) of Rule 10b-5.

■ A violation of Section 10(b) and Rule 10b-5, however, cannot rest simply on the presence of material misstatements or omissions. To make out such a violation the SEC must also demonstrate by at least a preponderance of the evidence that a certain state of mind existed on the part of one or both of the defendants. Unfortunately, the precise nature of the mental state which need be shown in this regard is an unsettled issue in the law. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), held that scienter, at least in the sense of an "intent to deceive, manipulate, or defraud," must be shown before private plaintiffs may be allowed to prevail in an action for damages under Section 10(b) and Rule 10b-5. The present case, on the other hand, is an SEC action seeking injunctive and disgorgement relief. The danger of "significantly broaden[ing] the class of plaintiffs who may seek to impose liability . . .", noted by the Court in *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. at 214–15 n. 33, 96 S.Ct. at 1391, would not result from the use of a mere negligence standard here. In addition, there is merit in the contention that differing policy foundations respectively underlie private damage actions and SEC injunctive actions. The first aim at equitably allocating financial losses incurred by individual members of the public. The second place the SEC in the role of protecting the public at large in a remedial way. In such circumstances, the harmful conduct itself, apart from the particular intent with which it was committed, may be the proper focus of concern. *Cf., SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The appropriate standard has been much debated and discussed. *Compare SEC v. Blatt,* 583 F.2d 1325 (5th Cir. 1978); *SEC v. Bausch & Lomb, Inc.,* 420 F.Supp. 1226, 1240–41 (S.D. N.Y.1976), *aff'd on other grounds,* 565 F.2d 8, 14 (2d Cir. 1977); *SEC v. American Real-ty Trust,* 429 F.Supp. 1148, 1170–71 (E.D. Va.1977), *reversed on other grounds,* 586 F.2d 1001 (4th Cir. 1978) (scienter required) *with SEC v. World Radio Mission, Inc.,* 544 F.2d 535, 540–41 (1st Cir. 1976) (scienter not required).

Nonetheless, the Court concludes that *Ernst & Ernst v. Hochfelder, supra,* forces the conclusion that scienter is an essential element of an SEC injunctive action under Section 10(b). The decision reached in that case rested on four bases. Three of those four apply with equal strength to SEC injunctive actions under Section 10(b). The language of Section 10(b) is the same whatever the nature of the relief sought. The Supreme Court's conclusion that the legislative history of Section 10(b) gives "no indication" that the section "was intended to proscribe conduct not involving scienter" also applies to this case. Third, the Supreme Court's discussion of Rule 10b-5's administrative history was not keyed to actions for damages as distinguished from actions for injunctive relief. The Court finds these factors to be sufficient to require that the SEC here prove some form of scienter relating to its Section 10(b) and Rule 10b-5 allegations. As noted above, this conclusion comports with the decisions in several recent cases.

■ *Ernst & Ernst v. Hochfelder, supra,* did not decide whether "scienter," for purposes of Section 10(b), could be said to embrace "reckless behavior," as well as an "intent to deceive, manipulate, or defraud." *See id.,* 425 U.S. at 193–94 n. 12, 96 S.Ct. at 1381. It appears to this Court that the Commission is entitled to a finding of a Section 10(b) violation here if it can show reckless conduct meeting the test laid down in *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2nd Cir. 1978). The court stated there:

> Reckless conduct is, at the least, conduct which is "highly unreasonable" and which represents "an extreme departure from the standards of ordinary care . . to the extent that the danger was either known to the defendant or so obvious

that the defendant must have been aware of it." *Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir. 1977). (Footnote omitted).

For reasons that are subsequently discussed under the heading of "Relief," the Court concludes that the SEC has failed here to prove that either of the defendants acted with an intent to deceive or in a reckless fashion in connection with the material misstatements and nondisclosures made by Credit. Accordingly, the SEC has not shown that defendants violated Section 10(b) or Rule 10b–5.

### B. Section 17(a)(3)

The SEC has two theories under Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3) (1976). That section provides in pertinent part that

> It shall be unlawful for any person in the offer or sale of any securities . . . directly or indirectly . . . (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

#### 1. Exchange Offer

The SEC's first contention under Section 17(a)(3) focuses on the Exchange Offer Prospectus of September 1975. According to the SEC, the material misrepresentations and omissions contained in that document (and found above) operated as a "deceit" upon the 1975 debenture holders who were "purchasers" in the context of the exchange "offer." The Court agrees that the SEC's theory does not amount to a strained interpretation of the plain words of the statute. ▄▄▄ Furthermore, the Court concurs with the Second Circuit's holding that scienter need not be shown in an SEC injunctive action under Section 17(a). *SEC v. Coven,* 581 F.2d 1020 (2d Cir. 1978). *See SEC v. American Realty Trust,* 586 F.2d 1001 (4th Cir. 1978); *SEC v. Savoy Industries, Inc.,* 190 U.S.App.D.C. at 285, 587 F.2d at 1172 (1978); *SEC v. World Radio Mission, Inc.,* 544 F.2d 535, 541 n. 10 (1st Cir. 1976); *SEC v. Van Horn,* 371 F.2d 181, 184–86 (7th Cir.

1966). Accordingly, since the defendants here acted negligently in connection with the material misrepresentations and omissions contained in the Exchange Offer Prospectus, the Court concludes that they violated Section 17(a)(3) in connection therewith.

#### 2. Treasury Stock Transactions

The SEC's second contention under Section 17(a)(3) is that Credit, as "purchaser," was the victim of fraud perpetrated by Properties in connection with the treasury stock purchases. According to the SEC, the transactions deprived Credit of valuable cash which it needed to retire the 1975 debentures and gave Credit nothing of substance in return.

Section 17(a)(3) may well engulf a broader range of "fraudulent" conduct than does Rule 10b–5. While Section 10(b) of the Exchange Act does not contain the term "fraud," Section 17(a)(3) of the Securities Act does. The rationale of *Santa Fe Industries, Inc. v. Green, supra,* therefore, may not apply to actions brought under Section 17(a)(3). The Court need not decide this issue, however, because, as will be shown, this case does not present a situation involving "fraud" as that term is understood in its traditional sense.

▄▄▄ The SEC has proceeded under the theory that the treasury stock transactions, occurring at the times they did, were profoundly inconsistent with Credit's obligation to repay its 1975 debentures. The first answer to this argument is that the indentures under which Credit operated explicitly permitted the transactions in question. Those documents did not establish restrictions on how much time had to elapse between a stock redemption and the debentures' maturity date. More importantly, the SEC has not adequately demonstrated that—at the times these purchases were made—reasonable businessmen in the position of Credit's management could not have viewed the transactions as being in Credit's debenture holders' best interests. Credit's income derived almost exclusively from payments made by Properties' customers on

the installment land contract receivables Credit held. The contracts which Properties entered into with these customers obliged it to perform various development work. Such work demanded considerable sums of cash; only Credit could realistically provide this cash.[18] Had this work not been performed, Properties' customers would have had every right to cease their payments; this, in turn, would have curtailed Credit's income. Defendants testified that, given these circumstances, they entered in good faith into all of the cited supporting transactions to maintain the integrity of Credit's assets and derivatively to ensure the continued flow of Credit's income; for, aside from renewed borrowing, Credit's income was the only source Credit had to repay its debentures. The plaintiff has not proved by the preponderance of the evidence that the defendants did not have this intent. Indeed, as discussed below, the Court affirmatively finds that the defendants had the intent they now profess. The SEC did attempt to show in its papers that the cash advanced by Credit exceeded any amount Properties could have been contemporaneously spending on its development work. The Court believes, however, that the defendants' rebuttal to this argument clearly demonstrates that the plaintiff has not borne its burden of proof on this matter. Finally, it is unclear to the Court how the course of conduct preferred by the SEC could have possibly benefitted Credit's 1977 debenture holders, even had it provided sufficient cash to retire the 1975 debentures. According to the SEC, Credit should have held onto most of its cash during the latter part of 1974 and throughout 1975 so that it could have retired the 1975 debentures at their maturity. The implicit assumption underlying this suggestion must be that massive land sale contract cancellations would not have immediately followed the cessation by Properties in late 1974 or mid-1975 of its development work. This assumption has its obvious weaknesses. But, even apart from this, the SEC's suggestion appears to ignore the needs of the 1977 debenture holders. Certainly by the time their debentures became due, the inevitable land sale contract cancellations, delayed for the benefit of the 1975 debenture holders, would have occurred. In sum, the stock transactions have not been shown by the preponderance of the evidence to have operated as a fraud upon Credit's debenture holders.

## C. Failure to Make Advance Disclosure

As a further aspect of its fraud claims, the SEC contends that, prior to each stock transaction and fixed asset transaction, the defendants had a duty to warn the public of their intention to effectuate the transfer; and that they had this obligation regardless of whether or not Credit had, at the particular time, an independent obligation to submit a public filing to the SEC. The Commission's argument is that advance disclosure would have permitted the debenture holders "to exercise their rights under the Indenture."

The SEC provides the Court with no authority for the legal proposition it advances. Neither of the indentures required debenture holder preclearance of the transactions in question, since the SEC has not demonstrated that Credit's management did not have good reason to believe that the transfers were consistent with the indentures' restrictions. The SEC also directs the Court to no state law rule requiring advance notification. Finally, the cases cited by the SEC do not support its position. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 474 n. 14, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), though distinguishable, appears in fact to have rejected a similar claim. There, minority shareholders had been "frozen out" of a corporation through use of Delaware's "short form" merger provisions. They sued, claiming that the majority shareholder's failure to give advance notice of the merger constituted a material nondisclosure under Rule 10b-5. Since, how-

---

18. It should be noted that Credit's bankruptcy trustees continued the practice of making Credit's cash available to Properties to perform the necessary development work. (Credit's 1975 10-K, p. 37, filed in 1977).

ever, state law did not require advance notification and afforded the minority shareholders only one remedy—appraisal, the Court found no material nondisclosure. *SEC v. Parklane Hosiery Co.*, 558 F.2d 1083, 1087–88 (2d Cir. 1977), is a stronger case for the SEC. That case found that certain information about a merger should have been disclosed in advance to the corporation's shareholders: the information "could have been used by the minority shareholders to attempt to enjoin the merger." There, however, advance disclosure of material information respecting the merger was mandated by federal law by virtue of the fact that state law required shareholder clearance of the merger. Since pre-action notification was, therefore, required, the court decided that "materiality" should be judged, not just by whether the nondisclosed information could have had a bearing upon the shareholders' "choice to either accept the offering price or to exercise their right of appraisal," but also by whether it would have given the shareholders ammunition to pursue an action for injunctive relief. Here, the SEC points to no analogously independent requirement of advance disclosure. In the absence of such a requirement, this Court is unwilling to create one, as the SEC would have it do, merely because the information involved might have induced an injunctive action. Countless acts of a corporation could be the potential subjects of injunctive suits by dissident security holders. This alone cannot be sufficient reason to require advance disclosure of those acts' likely consummation. Logically, the SEC's position would force corporations to disclose all corporate acts of any import prior to their consummation. The Court is unwilling to read the federal securities laws so expansively.

## V. Relief

The Commission seeks a permanent injunction directed against each individual defendant enjoining future violations and affirmative disgorgement by each of them of the compensation and other benefits they received from GAC during 1974 and 1975.

Even though material omissions have been found in certain of the public filings for which defendants, among others, were responsible, the Court sitting in equity has discretion to fashion relief in the light of all the facts and circumstances of the case.

## A. Injunctive Relief

The occurrence of past violations of the securities laws alone is generally not sufficient to justify the imposition of a permanent injunction. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975). Rather, the fundamental factor determining the appropriateness of injunctive relief is whether or not there currently exists positive proof of a reasonable likelihood of future illegal conduct. *SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 18 (2d Cir. 1977). Several considerations enter into this determination, the most important of which are: whether the defendants' prior illegal conduct was repeated and persistent or merely amounted to an isolated incident, *id.* at 18; *SEC v. Commonwealth Chemical Securities, Inc.*, 574 F.2d 90, 100 (2d Cir. 1978) (Friendly, J.), whether there is proof of scienter or fraud, *SEC v. Commonwealth Chemical Securities, Inc., supra*, 574 F.2d at 100; *SEC v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976), whether the violations were flagrant and outrageous or merely technical, *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972), the defendants' current attitude toward their past violations, and whether or not the defendants are now in positions where future violations can be anticipated, *SEC v. Commonwealth Chemical Securities, Inc., supra*, 574 F.2d at 100.

Against these standards the Court will first consider whether or not either defendant was shown by the proof to have had scienter or fraudulent intent in connection with the material omissions as to which the SEC has pointed its attack. In the process of this discussion, the Court will also consider the degree to which the omissions made were flagrant.

While Properties and Credit were, in theory, separate entities, in fact they were each dependent on the other. If Properties succeeded, Credit would flourish. If Properties failed, Credit would also fail. No one who bought or held Credit's debentures could have been unaware of this obvious truth, for Credit's prospectuses and public filings made clear that Credit was merely Properties' captive credit company, bound by the Operating Agreement, run by common officers and directors, and inextricably tied to the fate of Properties' land sale business and ability to meet the development obligations. Properties failed. It failed gradually as events and adverse economic circumstances overtook it; gradually but ineluctably. Credit's 1974 10–K revealed this deterioration. The 1975 Exchange Offer Prospectus and Solicitation Statement even more forcefully described the impending debacle; the likelihood that bankruptcy would follow should the 1975 debenture holders reject the exchange offer or should the 1977 debenture holders refuse to accede to the requested indenture changes could not have been made clearer. No criticism can be leveled at the accuracy of the explanation given by these three documents of Credit's and Properties' demise. Nor can it be gainsaid that the filings amply alerted the typical debenture holder to the fact that Credit was purchasing many atypical assets from Properties, the only possible reason being that all possible means were being used to supply Properties with Credit's cash.

■ GAC's chief executive officer, defendant Wills, with the customary optimism of many entrepreneurs, strove to keep the Credit-Properties enterprise above water. He did not intend to favor Properties or GAC over Credit in the process of so doing, and the SEC concedes that he remained optimistic during 1975 about GAC's future despite the adverse events. The Court accepts his testimony as credible. He did not intend to deceive. In fact, he favored full disclosure and did nothing to prevent his lawyers and outside accountants from being fully apprised of the relevant facts, for he relied substantially on their advice. Compared to the disclosures which were made, the nondisclosures and misrepresentations which the Court has found, though they were material, certainly had less import.[19] It is likely that Wills as he lived through the events which led to the company's bankruptcy did not have the time, the objectivity, or the perspective to realize the significance of the inadequacies in either the 1974 10–K or the 1975 documents. Hindsight has made the SEC's task much simpler. In sum, the Court is satisfied that, although Wills acted negligently, he had no intent to deceive, no purpose to defraud, and did not act with reckless disregard of the law.

Defendant Stuken was apparently not an originator but a follower. He was swept up in the course of events, worked at the business at hand each day and went along. His keen accounting training gave him, if anything, a clearer understanding of the implications of the events as they occurred than Wills. He was also the primary source of information for the outside attorneys and accountants who assisted Credit in preparing its SEC filings. Yet, the SEC has not

**19.** The one possible exception to this was the omission of Credit's June 1975 balance sheet figures from the Exchange Offer Prospectus and the Solicitation Statement. The Commission argues that this omission was deliberate and was obviously done with an intent to deceive. The defendants naturally deny these contentions. The Court concludes that the plaintiff has not proven by the preponderance of the evidence that the defendants had the intent ascribed to them by the Commission. A major reason is that the particular omission in question was not alleged in the SEC's "Statement of Material Omissions," filed prior to trial on March 13, 1978, or, for that matter, in the Commission's Post-Trial Memorandum filed on June 9, 1978. The Court had requested the pretrial Statement of Material Omissions because of the considerable confusion which had theretofore permeated the Commission's position and had made clear to the SEC's counsel before trial that they would be bound by the contentions in that Statement. It would now be manifestly unfair to find, through inference, that the defendants acted with scienter in connection with the omission in question; at trial the issue did not appear to be in the case and the defendants accordingly had no reason to rebut what subsequently became a contention.

shown that he concealed anything from those outside advisors. Moreover, Credit's outside counsel testified that Stuken frequently offered them information in addition to that which they had requested to prepare the pertinent filings, and never suggested that any information be withheld from the public. Stuken was not the drafter of the statements in the SEC filings, although his input was significant in their preparation and, like Wills, he reviewed them prior to issuance. The Court is unable to find on the preponderance of the evidence that Stuken intended to deceive or acted recklessly.

In considering whether or not an injunction is appropriate in these circumstances, the Court is greatly handicapped by a lack of information as to the role and intent of various other individuals apparently involved. When the complaint was filed it also named Russell E. Kemmerer, President of Credit, and Marvin F. Hartung, an outside attorney, as defendants. Both of these men accepted without admission a standard SEC consent decree enjoining future violations. Mr. Kemmerer ran Credit on a day-to-day basis, and managed Credit's cash accounts. Mr. Hartung played a critical role in preparing Credit's public filings with the SEC. His part in the relevant events is particularly significant because every businessman must rely to some extent on the advice of outside counsel and auditors as to the appropriate contents of filings with the SEC. Although reliance on such advice can rarely, if ever, rise to the level of a defense to a securities law violation, it has to be deemed relevant on the appropriateness of injunctive relief. *See* Hawes & Sherrard, *Reliance on Advice of Counsel as a Defense in Corporate and Securities Cases*, 62 Va.L.Rev. 1, 94–102, 147 (1976), and the cases cited therein. In this case, the defendants relied to a considerable extent on the direction of outside counsel and auditors, who spent a good part of their time on GAC's affairs. For instance, both of the latter apparently knew about the development guarantees, but deemed them insufficiently material to require their disclosure, and as a consequence did not suggest to Credit that they be disclosed. Outside counsel and auditors also knew that Credit was transferring all of its cash receipts to the GAC cash pool as a matter of course.

It should be noted that both Wills and Stuken are no longer connected with the GAC complex of companies now in bankruptcy. Stuken works for a bank and Wills is a semi-consultant in real estate matters in Florida. It is reasonable to assume that both men may well become engaged with concerns subject to SEC regulation at some later date. There is no proof that leads the Court to believe either of them will, if this occurs, intentionally misrepresent or omit material information. Their violations may have been repeated, but were not flagrant or outrageous. It is not the role of equity to punish. Lacking requisite proof of a threat of future wrongdoing, the Court in its discretion finds no basis for entering the harsh injunction sought.

B. *Disgorgement*

The SEC has also requested that the Court require the defendants to disgorge the compensation they received from GAC during 1974 and 1975. The amounts in question were received in return for the services they rendered GAC during the time period at issue in this case.

Disgorgement is one of several remedies which a court of equity has at its disposal to redress a securities law violation. *See* Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) (1976) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa (1976); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103–04 (2d Cir. 1972). The objective of such an order is to deprive a securities law violator of the fruits of his illegality. Accordingly, the cases permit the disgorgement of "illicit profits" or "proceeds," *SEC v. Manor Nursing Centers, Inc., supra*, 458 F.2d at 1104, such as those derived from a fraudulent stock offering, *id.*; those derived from a fraudulent exchange offer, *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 390–91 (2d Cir.), *cert.*

*denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); and those derived from trading in securities through the use of inside information, *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307–08 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *SEC v. Shapiro,* 494 F.2d 1301, 1309 (2d Cir. 1974).

 The Commission has failed to demonstrate the appropriateness of such a drastic remedy here. It is not necessary to decide the precise nature of the causal link which the SEC must show between defendants' violations and the profits in question; in this case plaintiff has failed to demonstrate any reasonably close link between defendants' 1974 and 1975 corporate compensation and their illegal conduct. In order to make such a showing, particularly in the absence of any proof of scienter or fraud, the SEC would at least have had to demonstrate the following: (1) that, had the required disclosures been made, some likelihood existed that the defendants would have lost all or part of their jobs, *and* the point in time when this would in all probability have occurred; *or* (2) the extent to which the defendants' compensation during 1974 and 1975 can be attributed to their securities law violations as distinguished from those legitimate services which they did render to the GAC complex. The SEC offered no evidence at trial on these points and, in fact, now contends that the defendants bore the burden of first coming forward with evidence relating to this matter. This last contention is totally devoid of merit. *See Collins Securities Corp. v. SEC,* 183 U.S.App.D.C. 301, 562 F.2d 820 (1977).

 When the amounts to be disgorged cannot be related with sufficient certitude

1. The Court has not attempted to decide whether all the figures cited are necessarily accurate, for they differ in some small respects from the SEC's own figures. The figures in Credit's 1974 10–K, however, are concededly correct.

Frequently, the assets listed were sold back to Properties after their recordation on Credit's balance sheets.

to defendants' securities law violations, the SEC's disgorgement request takes on the character of a plea for punitive relief. The cases, however, are unanimous in refusing to accede to such a demand. *See, e.g., SEC v. Manor Nursing Centers, Inc., supra,* 458 F.2d at 1104–05; *SEC v. Texas Gulf Sulphur Co., supra,* 446 F.2d at 1308.

In this regard, the Court is also greatly troubled by the fact that the SEC's disgorgement request first appeared in this case shortly before trial. It was not contained in the SEC's original complaint. Only after the present defendants refused to succumb to a consent judgment did the SEC bring up the disgorgement request. The Court is cognizant of the rule that "he who seeks equity must do equity." No injunction or disgorgement will be entered.

## VI. *Conclusion*

For the foregoing reasons, the Court finds that the defendants violated Sections 13(a) and 14(a) & (e) of the Exchange Act, Sections 5(b)(1) and 17(a)(3) of the Securities Act, and Rules 13a–1, 13a–11 and 14a–9. The Court finds no violation of Section 10(b) of the Exchange Act or Rule 10b–5. Finally, the Court rejects the SEC's request for final injunctive and disgorgement relief.

## APPENDIX A

1. *April to December 1974*

Between April and December 1974, Credit's monthly financial statements (as found in GAC's internal books of account ("Gold Books"), in Credit's 1974 10–K, and in various of defendants' trial papers) reflected ownership of the following assets other than land installment contract receivables (in dollars): [1]

Interest income on the commercial paper, certificates of deposit and marketable securities was not credited to Credit's account during 1974, apparently through inadvertence.

| Date | Marketable Securities | Other Receivables [2] | Certificates of Deposit | Stock |
|------|------------------------|------------------------|--------------------------|-------|
| April | 5,800,000 | 1,300,000 | --- | --- |
| May | 980,000 | 1,237,334 | 3,500,000 | --- |
| June | 3,800,000 | 1,088,744 | 400,000 | --- |
| July | 3,900,000 | 366,241 | 800,000 | --- |
| August | 5,490,000 | 6,067,103 | 300,000 | --- |
| Sept. | 1,100,000 | 5,825,088 | 200,000 | 1,562,060 |
| Oct. | No Monthly Statement Prepared | | | |
| Nov. | No Monthly Statement Prepared | | | |
| Dec. | 8,500,000 [3] | 6,078,426 [3] | 945,000 | 17,600,755 |

The contemporaneous net purchases (sales) of installment land contract receivables apparently were:

| | | | |
|------|------------|------|-------------|
| April | (7,305,189) | Sept. | 1,351,723 |
| May | 1,938,124 | Oct. | ( 367,943) |
| June | 121,756 | Nov. | ( 1,098,649) |
| July | (1,087,359) | Dec. | (12,041,856) |
| August | ( 197,372) | | |

## 2. January—June 1975

Between January and June 1975, Credit's balance sheets reflected ownership of the following assets other than land installment contract receivables:

| Date | Fixed Assets | Other Receivables (Net) | Marketable Securities | Certs. of Deposit | Stock | Lease Receivables |
|------|--------------|--------------------------|------------------------|--------------------|-------|--------------------|
| Jan. | No Typed Monthly Statement | | | | | |
| Feb. | No Typed Monthly Statement | | | | | |
| Mar. [4] | 12,132,713 [5] | 6,977,339 | 1,500,000 | 850,000 | 2,527,453 (in addition to 1974 purchases) | 1,787,785 |

2. The category, "other receivables," consisted largely of notes receivable arising from the bulk sales of land by Properties to a few builder-developers.

3. Legal documents transferring title to Credit in these two investments were not executed on the date of sale.

As of January 31, 1975, many of Credit's December 1974 assets (all $9.4 million of marketable securities and certificates of deposit, plus $5.1 million of the $6.2 million of other receivables) were transferred back to GAC. These transactions were actually effected in March of 1975, even though they related back to January. GAC's accountant testified that the reason for the transfer was "not to sell these receivables back to Properties, but so that in January and subsequent months, they would again be purchased via top sheet entry." (Reichenbaum Dep., p. 292). Subsequently, GAC reinvested on Credit's behalf $2 million in commercial paper and purchased at a cost of $7.196 million, $7.667 million of Credit's debentures on the open market.

4. The figures for March 1975 were those which were reported in the Exchange Offer Prospectus, effective as of September 12, 1975. The June 1975 Gold Book figures were apparently reviewed by defendants Wills and Stuken prior to the effectiveness on September 12, 1975, of the Exchange Offer Prospectus.

5. In order to avoid a continuation of the 1974 practice of creating periodic piecemeal solutions to the intercompany account problem,

**1278**

| Date | Fixed Assets | Other Receivables (Net) | Marketable Securities | Certs. of Deposit | Stock | Lease Receivables |
|---|---|---|---|---|---|---|
| Apr. | | No Typed Monthly Statement | | | | |
| May | | No Typed Monthly Statement | | | | |
| June[4] | 11,348,898 | 7,887,171 | 7,175,902 | 4,472,500 | 591,232 (in addition to purchase in March) | 1,586,942 |

During the same period, net purchases (sales) of installment contract receivables by Credit from (to) Properties amounted approximately to:

| | | | |
|---|---|---|---|
| Jan. | 349,795 | April | 861,981 |
| Feb. | (870,205) | May | (2,677,725) |
| March | (186,909) | June | (928,976) |

Credit retired, through open-market purchases, approximately $20.3 million of its 1975 and 1977 debentures during 1974 and the first quarter of 1975.

### APPENDIX B

*Significant Relevant Disclosures*

A. *Disclosures in the 1974 10-K*

1. *The "business" of Credit*

The first page of the 1974 10-K stated that:

> The principal business of the Registrant since 1970 has been to provide financing for [Properties] by purchasing instalment land contracts arising from sales of land by Properties. The business of the Registrant is governed by an Operating Agreement . . .. (p. 1)

A fuller exposition of Credit's business was made at a later point:

> . . . . the Registrant owns the greater part of the receivables which have been generated by Properties land

sales operations. The Registrant receives cash from the collection of these receivables, payment of which to Properties or any other real estate subsidiaries of GAC is restricted, under the terms of the Operating Agreement and the indentures . . ., to payment for additional Eligible Receivables, release of withheld reserves against receivables collected, unpaid balances with respect to contracts purchased or as dividends or other payments with respect to its common stock within limitations prescribed by the foregoing indentures. . . . In the event of a protracted decline in GAC's retail land sales and consequent lack of Eligible Receivables available for purchase by the Registrant, the foregoing restrictive provisions could materially limit Registrant's ability to pay over cash collections on a day-to-day basis. (p. 2)

The 10-K also explained how funds flowed in relation to Eligible Receivables:

> [Credit sometimes holds] receivables for which payment had not been made to Properties. The Registrant from time to time makes payments to Properties against this balance, and Properties from time to time advances funds to the Regis-

management transferred in the spring of 1975 as many fixed assets as it could. Apparently, it was hoped that the surplus in the intercompany account which this would create would last until the effectuation of the anticipated exchange offer.

The assets involved included office equipment, construction equipment, golf courses, hotels, and other similar items. Most of these assets were promptly leased back to Properties on a long-term basis.

The assets were sold at book value, book value having been determined in 1969 on the basis of an appraisal of the assets. A subsequent appraisal conducted by Credit's trustees in bankruptcy showed that the book value was not markedly off appraised value ($1 million of $16 million).

The fixed asset transactions were first disclosed in a Form 10-Q filed by Credit on May 19, 1975. After some "restructuring," an amended 10-Q was filed by Credit on July 10, 1975. Defendants acted correctly in including the transactions, as restructured and not as originally effected, in its September 1975 public documents.

trant which are credited to the balance payable to Properties. (p. 3).

2. *Cash Flow and Retirement of the Debentures*

The 1974 10–K discussed the difficulties Credit might encounter in attempting to retire the 1975 debentures at maturity:

> Cash flow received by the Registrant from collections of receivables and funds available to the Registrant under its bank lines of credit or from other outside lenders will not be sufficient to repay the outstanding 12% Debentures at their maturity. The ability of the Registrant to repay the 12% Debentures will thus depend upon the receipt by it from GAC of funds at least equal to the amount of any deficiency. GAC projects positive cash flow in 1975 sufficient to retire 75% to 80% of the outstanding 12% Debentures. (p. 1).

. . . .

> Assuming substantial success of [various prospective sources of cash], . . . management believes that funds will be available to refinance at maturity any of the 12% Debentures not retired with cash provided from operations. (p. 2).

3. *Transactions in Eligible Receivables*

The 10–K reported that, during 1974, Credit had acquired from Properties $59,366,000 total gross unpaid principal amount of current Eligible Receivables. (p. 3). On the other hand, it was also pointed out that "GAC's retail land sales in 1974 declined 69% from 1973, partly in accordance with a programmed reduction and partly because of general economic factors [elsewhere described as "depressed"] over which GAC has no control." (p. 2).[6] The accountant's re-

port, appended to the 1974 10–K, revealed that Credit's holdings of net eligible receivables had declined by nearly $40 million during the preceding year, (p. 14), to $142,134,456 (p. 12).

4. *Transactions in Other Than Land Installment Contracts*

The 10–K disclosed that, on two occasions during 1974, Credit had purchased a total of 11,146 of its own shares of common stock. (p. 8). The fact that the corporation still had one shareholder was also pointed out. *Id.* The accountant's balance sheet revealed that these treasury stock transactions had cost Credit $17,600,755. (pp. 12 & 14).

The accountant's balance sheet indicated that, as of December 31, 1974, Credit owned $945,000 in certificates of deposit, and $8,500,000 in "marketable securities and other short-term investments, at cost which approximates market." *Id.*

Note (5) of the accountant's balance sheet revealed that, of the Eligible Receivables held by Credit, over $6,290,000 (in gross principal amount) consisted of "other receivables" (*i. e.,* other than installment land contract receivables) (p. 17).

At trial, the Commission's accounting witness was asked whether he "would have written a different 10–K?" His response was, "As a matter of the numbers I wouldn't." (Tr. p. 162).

5. *Summary of Figures Disclosed*

The following summary of Credit's operations for the year 1974 could be gleaned by a layman from the figures disclosed in the 1974 10–K:

---

**6.** In connection with this statement, the 1974 10–K disclosed that the number of lots sold was less than the number of contract cancellations, that "a reduction in sales does not greatly affect cash flow in any given year but the cumulative effect of a number of years of reduced sales may be significant," and that should sales remain at the 1974 level other sources of cash and revenue would have to be developed to retire or refinance the 11% Debentures due in 1977. (p. 2).

The SEC contends that this warning, apparently aimed at the 11% debenture holders, was

misleading to holders of the 12% Debentures since it suggested that the adverse sales trend would not affect Credit's ability to meet the November 1975 due date. This interpretation of the disclosure language is strained. No such meaning appears to have been intended, especially in view of the fact that the uncertainty of refinancing the 12% Debentures was a separate subject addressed in the immediately preceding paragraphs of the 10–K. The SEC has also not shown how the statement, as a factual proposition, was necessarily incorrect.

Credit's 1974 gross receipts: $57,473,473

Including:

$18,228,074 (interest income) (p. 13)

$39,245,399 (net decline in principal amount of receivables held) (p. 14)

Credit's 1974 expenses: $31,425,996

Including:

$ 628,531 (general and administrative) (p. 13)

11,297,158 (interest payments) (p. 13)

4,447,000 (income taxes) (p. 13)

5,129,000 (retirement of bank notes) (p. 14)

9,924,307 (purchases of senior debentures (p. 14)

Credit's other transactions: $26,102,311

$17,600,755 (stock purchases) (p. 14)

8,500,000 (marketable securities and short-term investments) (p. 14)

1,556 (increase in cash, including CD's) (p. 14)

**B. Disclosures in the September 1975 Exchange Offer Prospectus and Solicitation Statement**

**1. Description of Credit's Business**

The following excerpts in the two documents described the business in which Credit was engaged:

The principal business of the Company since 1970 has been to provide financing for Properties by purchasing instalment land contracts arising from sales of land by Properties. . . . (E.O., p. 3; S.S., p. 3).

Since 1970, the Company's business has been to act as an instrument for raising cash to finance the activities of Properties. The Company borrows funds which it uses to acquire Eligible Receivables . . . ., consisting principally of instalment land sales contracts, primarily from Properties and occasionally from other subsidiaries of GAC. The funds received by the Company from the collection of payments of principal and interest on the receivables thus acquired are employed by the Company to service its debt and to purchase additional receivables. The Company's business is governed by the terms and conditions of the Operating Agreement and the Company's Indentures . . . .. The Company's management believes that both it and Properties are in substantial compliance with the terms and conditions of the Operating Agreement. (E.O., p. 19; S.S., p. 19).

**2. Need for the Exchange Offer**

The two documents suggested the events which had led up to the need to effectuate an Exchange Offer:

The Company will not have sufficient cash available to repay the outstanding Old Debentures in full at maturity. If the maturity of the major part of this indebtedness cannot be extended through consummation of this Exchange Offer, the Company will probably find it necessary to seek court protection under the bankruptcy laws. (E.O., p. 4; see also S.S., pp. 3–4).

Because Properties' operations depend upon cash received from the sale to the Company of receivables and other payments permitted by the Operating Agreement and the Company's debt instruments . . . ., the Company is not able to accumulate all of the cash which it receives from the collection of receivables owned by it towards the repayment of its debt. (E.O., p. 5; S.S., p. 6).

[S]ince the end of 1971, there has been a drastic decline in the volume of Properties' instalment land sales and a substantial increase in the rate of cancellations of prior years' sales. . . . (E.O., p. 5; S.S., p. 6).

. . . The deterioration of Properties' business has made it unlikely that the Company, Properties or GAC can raise a sufficient amount of money to repay the Old Debentures through outside borrowing and GAC and Properties are unable to supply the necessary funds from other sources. . . . (E.O., p. 6; S.S., p. 6).

In the past three years, Properties' business has suffered from various adverse factors, some of which have affected the retail land sales industry in general, . . .. Properties has also been the object of a much-publicized investigation by the Federal Trade Commission, which culminated in a consent order, and has been subjected to several class action lawsuits . . .. (E.O., p. 8; S.S., p. 9).

### 3. *The Close Economic Relationship Between Credit and Properties*

The Exchange Offer Prospectus and the Solicitation Statement delineated the salient respects in which Credit's business was tied to Properties' and vice versa:

It is expected that, unless the Company is able to pay additional cash to Properties, which would require the amendments to the 1971 Indenture described [elsewhere in the documents] Properties will not have access to sufficient cash from the Company, or from other sources, to meet its obligations under the Operating Agreement to complete development work by required dates on land subject to instalment contracts held by the Company, or to repurchase cancelled receivables from the Company (including cancellations resulting from non-compliance with development commitments), or both. The consequences of failure by Properties to perform either of the foregoing obligations would be that (i) the Company would no longer be permitted to make cash payments to Properties, and (ii) there would be an erosion of the Company's receivables which in turn would lead to a default by the Company under the Indenture provision requiring the maintenance of a 150% level of net earnings available for fixed charges . . . or under other provisions. (E.O., p. 6; S.S., p. 4).

Although organized as two separate legal entities, the Company and Properties are substantially interdependent, and matters adversely affecting either company may be expected to have a parallel effect upon the other company. The Company depends upon Properties for supporting services and operating management, for the performance of the land development work required to maintain the collectibility of its receivables . . . , and for the generation of new receivables to replace those which have been cancelled or have matured.

Properties depends upon the Company, which holds the bulk of the receivables which have resulted from its past sales, for a major part of its cash flow. As a result of declining land sales, Properties has been unable to obtain sufficient cash for development and other purposes from the sale of receivables to the Company or to obtain financing from outside sources. The Company has supplemented Properties' cash flow by repurchasing shares of its common stock from Properties (in place of paying dividends), and by acquiring certain of Properties' fixed assets and lease receivables relating to other fixed assets of Properties . . . .. The Company will continue to purchase instalment land receivables from Properties; and, to the extent permitted by the terms of its Indentures, will make secured advances to Properties and continue to pay dividends or make treasury stock purchases . . . to assist Properties to meet its development and other obligations. Consequently, the Company has not been, and will not be, able to accumulate all the cash which it receives from the collection of receivables owned by it towards the repayment of its debts and its cash needs must be balanced with those of Properties. (E.O., pp. 7–8; S.S., pp. 7–8).

As is generally the case with captive finance subsidiaries, dealings between the Company and Properties are not at arm's length and at times may involve possible conflicts of interest . . . .. (E.O., p. 9; S.S., p. 9).

### 4. *Transactions in Other Than Eligible Receivables*

. The Exchange Offer Prospectus and the Solicitation Statement revealed that Credit had, during 1975, purchased a substantial

quantity of fixed assets at their net book value from Properties, which assets it had promptly leased back to Properties. (E.O., pp. 20, 23, 47; S.S., pp. 20, 23, 42). These assets were described as "real estate, machinery, equipment, furniture and fixtures." (E.O., p. 23; S.S., p. 23). This series of transactions was explained as follows:

> On the basis of the Company's March 31, 1975 unaudited balance sheet, the Company cannot pay dividends to Properties or repurchase additional shares of its own stock from Properties under the terms of the Indenture relating to the 11% debenture issue. Because of such restrictions and because of the need for funds for land development and other expenses, Properties and its subsidiaries sold, directly or indirectly, most of their property, plant and equipment to the Company in 1975 on a sale and lease back basis. (E.O., p. 44; S.S., p. 39).

In addition, the treasury stock purchases effected during both 1974 and 1975 were disclosed. (E.O., pp. 20, 22; S.S., pp. 20, 22). Credit admitted that the total amount of these purchases was "approximately the maximum amount which was available during the period for the payment of dividends or purchases of stock under the terms of the Company's Indentures." (E.O., p. 22; S.S., p. 22). It was further revealed that:

> The management of the Company anticipates that it will continue to repurchase shares of its common stock from Properties or, alternatively, to pay dividends with respect to its stock to Properties to the extent permitted by the Indentures, if such payments will assist Properties to perform its development and other obligations. (E.O., p. 22; S.S., p. 22).

C. *Disclosures Relating to the Development Obligations Undertaken by Credit*

The assurance given the Florida Board was not divulged until the second filing on August 28, 1975 (p. 20). Significantly, it

was also disclosed there that "the amounts withheld by the Company for the performance of development are in most cases less than the total estimated cost of performing the related development work." (*Id.*; *see also* E.O., p. 20; S.S., p. 20).

Credit filed a Form 8–K on October 11, 1974, discussing the settlement of the two class actions and some of its details. No mention was made in this document or in any other relevant public filing [7] of the related guarantee of Properties' development obligations.

---

7. The settlements were filed with the SEC on July 1, 1975, as an exhibit to Credit's Registration Statement for its proposed Exchange Offer, but were not disclosed in the Preliminary Prospectus then filed, in the ultimate Exchange Offer Prospectus, or in the ultimate Solicitation Statement.